AO 91 (Rev. 02/09) Criminal Complaint

# United States District Court
### for the
### Western District of New York

**United States of America**

**v.**

**Case No. 25-mj-1244**

**DARRYL LAMONT PAUL,**
**a/k/a DARRYL LAMONT,**

_____

*Defendant*

### CRIMINAL COMPLAINT

I, the complainant with respect to Counts 1 through 2 in this case, state that the following is true to the best of my knowledge and belief.

### COUNT 1
### (Attempted Sex Trafficking by Force, Fraud, and Coercion)

In and around July 2024, the exact dates being unknown, in the Western District of New York, and elsewhere, the defendant, DARRYL LAMONT PAUL, a/k/a DARRYL LAMONT, did knowingly recruit, entice, harbor, transport, provide, obtain, advertise, maintain, patronize, and solicit, by any means, in and affecting interstate commerce, a person, that is, Victim 1, knowing and in reckless disregard of the fact that means of force, threats of force, fraud, and coercion, and any combination of such means, would be used to cause Victim 1 to engage in a commercial sex act

**All in violation of Title 18, United States Code, Sections 1591, 1594.**

### COUNT 2
### (Possession with the Intent to Distribute Narcotics)

In and around July 2024, the exact dates being unknown, in the Western District of New York, and elsewhere, the defendant, **DARRYL LAMONT PAUL, a/k/a DARRYL LAMONT**, did knowingly and intentionally possess with intent to distribute a mixture and substance containing cocaine, a Schedule II controlled substance in violation of Title 21, United States Code, Sections 841(a)(1) and 841(b)(1)(C).

**All in violation of Title 21, United States Code, Sections 841(a)(1) and 841(b)(1)(C).**

☒  Continued on the attached sheet.

*Jaclyn Coyne*

*Complainant's signature*

JACLYN M. COYNE
SPECIAL AGENT
Federal Bureau of Investigations

*Printed name and title*

Sworn to and signed telephonically.

Date:   March  12    , 2025

*Judge's signature*

City and State:  Buffalo, New York

HONORABLE JEREMIAH J. MCCARTHY
UNITED STATES MAGISTRATE JUDGE

*Printed name and title*

## AFFIDAVIT IN SUPPORT OF CRIMINAL COMPLAINT

STATE OF NEW YORK )
COUNTY OF ERIE          )          SS:
CITY OF BUFFALO       )

**JACLYN M. COYNE**, being duly sworn, deposes and states as follows:

1.      I am a Special Agent with the Federal Bureau of Investigation ("FBI") and have been so employed since 2016. I am currently assigned to the Buffalo Field Office and to the White Collar Crime Squad within that office. My duties include the investigation of public corruption offenses. Previously, I was assigned for approximately 6 years to work public corruption cases with the FBI in Connecticut. Accordingly, I am an investigator or law enforcement officer of the United States, within the meaning of Title 18, United States Code, Section 2510(7), and I am empowered by law to conduct investigations of, and to make arrests for, the offenses enumerated in Title 18 and Title 21.

2.      I have participated in several narcotics investigations during the course of which I have conducted physical and wire surveillance, executed search warrants, and reviewed and analyzed recorded conversations and records of drug traffickers. Through my training, education, and experience (including debriefing cooperating drug traffickers, monitoring wiretapped conversations of drug traffickers, and conducting surveillance on numerous occasions of individuals engaged in drug trafficking), I have become familiar with the manner in which illegal drugs are imported and distributed, the method of payment for such drugs, and the efforts of persons involved in such activities to avoid detection by law

enforcement. I have also participated in investigations involving sex trafficking and through my training, experience, and conversations with other investigators, witnesses, and victims, I am familiar with how individuals involved in sex trafficking activity use force, fraud, and coercion to cause victims to engage in commercial sex acts. These methods include, but are not limited to, exploiting the drug addiction of vulnerable females and their fear of suffering through severe withdrawal symptoms, psychological, physical, financial, emotional, and other control tactics. My investigative experience detailed herein, as well as the experience of other law enforcement agents who are participating in this investigation serve as the basis for the opinions and conclusions set forth herein.

3.    I make this affidavit in support of a criminal complaint charging **Darryl LAMONT Paul, a/k/a Darryl LAMONT** ("**LAMONT**"), with violating Title 18, United States Code, Sections 1591, 1594 (attempted sex trafficking through force, fraud, and coercion) and Title 21, United States Code, Sections 841(a)(1) and 841(b)(1)(C) (possession with the intent to distribute cocaine).    As set forth below, in and around July 2024, **LAMONT** distributed narcotics, which he stored in his residence, and, using force, fraud, and coercion, attempted to cause Victim 1 to engage in commercial sex acts with him and others, in the Western District of New York.

4.    The statements contained in this affidavit are based on my involvement in this investigation, as well as information provided to me by other law enforcement officers involved in this investigation, my consultation with experts in sex trafficking, and upon my training and experience.  Because this affidavit is being submitted for the limited purpose of seeking a criminal complaint, I have not included each and every fact known to me

concerning this investigation.  I have set forth only the facts that I believe are necessary to

establish probable cause to believe that **LAMONT** violated Title 18, United States Code,

Section 1591, 1594 (attempted sex trafficking through force, fraud, and coercion) and Title

21, United States Code, Section 841(a)(1) and 841(b)(1)(C) (possession with the intent to

distribute cocaine).

## RELEVANT STATUTES

**A.    Sex Trafficking by Force, Fraud, and Coercion**

5.    Title 18, United States Code, Section 1591 states, in relevant part, as follows:

> (a)    Whoever knowingly-(1) in or affecting interstate or foreign commerce, or within the special maritime and territorial jurisdiction of the United States, recruits, entices, harbors, transports, provides, obtains, advertises, maintains, patronizes or solicits by any means a person; or (2) benefits, financially or by receiving anything of value, from participation in a venture which has engaged in an act [just] described. . . . knowing, or in reckless disregard of the fact, that means of force, threats of force, fraud, or coercion, or any combination of such means will be used to cause the person to engage in a commercial sex act.

2 Modern Federal Jury Instructions-Criminal P 47A,03 (2025).

6.    Title 18, United States Code, Section 1594(a) states that "[w]hoever attempts

to violate section . . . 1591 . . . shall be punishable in the same manner as a completed violation

of that section."

7.    Assistant United States Attorney Caitlin M. Higgins has advised me that the

Modern Federal Jury Instructions define coercion as "a threat of serious harm or physical

restraint against a person." *Id.*  A threat of serious harm may include:

> [P]sychological, financial, or reputational harm, that is sufficient under all of the surrounding circumstances to compel a reasonable person of the same background and in the same circumstances to perform or to continue performing commercial

sexual activity in order to avoid incurring that harm.   In
determining whether the defendant made a threat of serious
harm that could reasonably be believed by [the victim], [a jury]
should consider [the victim's] particular station in life, physical
and mental condition, age, education, training, experience, and
intelligence.  A threat of serious harm must be sufficient in kind
or degree to completely overcome the will of an ordinary person
having the same general station in life as that of [the victim],
causing a reasonable belief that there was no reasonable choice
except to engage in a commercial sex act as directed by the
defendant

*Id.*

8.      Likewise, Assistant United States Attorney Caitlin M. Higgins has advised me

that fear of severe withdrawal symptoms from narcotics addiction also constitutes serious

harm under the statute. *See, e.g.*, *United States v. Shine*, No. 20-314, 2022 WL 761520, at *2–

*3 (2d Cir. Mar. 14, 2022) (noting that the defendant "exploited victims' ... withdrawal ... to

compel them to engage in commercial sex acts when they otherwise would not have done

so," and citing specific testimony from victims along those lines).


9.      Based upon my training and experience, including observing expert testimony

in the area of sex trafficking, I have learned that sex traffickers often employ different

trafficking styles based on the vulnerabilities unique to each victim.  For example, a sex

trafficker can be a "CEO Pimp," who uses the lure of jobs—whether real or not—as a ploy to

recruit women.  A sex trafficker may also pose as a "Romeo Pimp," who approaches his or

her victims under the guise of seeking a romantic relationship.  A "Romeo Pimp," may

provide his victim with food, shelter, human affection—things victims are often lacking.

Guerilla pimps employ violence and militant control over their victims.  I have learned that

is common for sex traffickers to use more than one style, or combine one more than one style,

of trafficking on any given victim.  I have also learned that it is nearly universal that a victim

will have, at some point, engaged in sexual contact with her trafficker.

10.     Based upon my training and experience, including observing expert testimony in the area of sex trafficking, I have learned traffickers, regardless of type, prey on various vulnerabilities in victims.  These vulnerabilities include, but are not limited to, young age, poverty, family turmoil, lack of education, financial distress and desperation, a history of trauma and abuse, and drug addiction.  Moreover, I have learned that traffickers are masters at identifying vulnerabilities in potential victims and adapt their trafficking style to optimize manipulation of these vulnerabilities.

11.     Based upon my training and experience, including observing expert testimony in the area of sex trafficking, sex traffickers often exploit a power imbalance between themselves and their victims and exert financial control over victims as a means of coercion. For example, a sex trafficker can threaten to "blackball" a victim from working for anyone else, which constitutes a threat of serious harm to a victim who is in financial distress with limited employment options.

12.     Based upon my training and experience, including observing expert testimony in the area of sex trafficking, sex traffickers often use drugs as a method to control and coerce victims. Drugs, like cocaine, often lower an individual's inhibitions and allow the person to feel numb.  Although some victims come to traffickers with an existing addiction, others use drugs for the first time as a result of their traffickers. Once a victim is addicted, a sex trafficker can toy with the addiction by withholding drugs from a victim, knowing that an addict will

do nearly anything to avoid the devastating symptoms of withdrawal.

13.     In this investigation, based upon witness and victim statements, subscriber records, and electronic evidence such as text messages and social media, there is probable cause to believe that **LAMONT** engaged in sex trafficking through the use of force, fraud, and coercion and possessed, with the intent to distribute, cocaine as a means to facilitate his sex trafficking.

14.     Specifically, based on the investigation to date, there is probable cause to believe that **LAMONT** attempted to coerce Victim 1 into engaging in a commercial sex act in exchange for a thing of value.  There is probable cause to believe that **LAMONT** attempted to coerce Victim 1 in, *inter alia*, the following ways:  (1) by preying on her youth and lack of financial stability; (2) by employing psychological manipulation to induce fear and emphasizing the power imbalance; (3) by providing and forcing her to drink alcohol and do cocaine; and (4) by suggesting her to move in with him.

**B.      Possession with the Intent to Distribute Cocaine**

15.     Title 21, United States Code, Sections 841(a)(1) and 841(b)(1)(C) provide, in relevant part, as follows:

> (a)      [I]t shall be unlawful for any person knowingly or intentionally—(1) to manufacture, distribute, or dispense, or possess with intent to manufacture, distribute, or dispense, a controlled substance
> (b)      (1)(C) In the case of a controlled substance in schedule I or II, such person shall be sentenced to a term of imprisonment of not more than 20 years.

16.     AUSA Caitlin M. Higgins has advised me that "[d]istribution does not require a sale," and that it is enough that a defendant "pass on, or . . . hand over to another" narcotics. *See* 3 Modern Federal Jury Instructions-Criminal P 56.01 (2025).

17.     Based on the investigation to date, including witness and victim interviews, there is probable cause to believe that **LAMONT** possessed with the intent to distribute cocaine and did distribute cocaine to Victim 1 and others.

## PROBABLE CAUSE

18.     On February 25, 2021, a federal grand jury returned a Second Superseding indictment against two defendants, including Convicted Person 1 ("CP-1"). *See* 19-cr-227, Docket No. 89.   CP-1 owned Pharoah's Gentlemen's Club ("PGC").   Count 6 of that indictment charged CP-1 in a sex trafficking conspiracy wherein CP-1 was alleged to have "knowingly, willfully, and unlawfully combine, conspire, and agree with others, known and unknown, to knowingly recruit, entice, harbor, transport, provide, obtain, and maintain by any means, in an affecting interstate and foreign commerce, persons, and to benefit, financially and by receiving anything of value, from participation in a venture which has engaged in such acts, knowing and in reckless disregard of the fact that means of force, threats of force, fraud, and coercion, and a combination of such means, would be sued to cause such persons to engage in a commercial sex act." *See id.* at 32.

19.     On December 27, 2024—after hearing weeks of testimony and evidence—a

federal jury found that CP-1 was guilty of engaging in a conspiracy with others known and unknown to commit sex trafficking through force, fraud, and coercion. The testimony included numerous victims who demonstrated that CP-1 preyed upon their vulnerabilities—such as age, financial distress, and drug addictions—to coerce them into engaging in sexual conduct with him and others in exchange for money and drugs.

20.     During the CP-1 investigation, **LAMONT** was identified as an associate—and eventually believed to be an unindicted co-conspirator—of CP-1.

21.     **LAMONT** owns NoLimit Entertainment ("NLE"), which is a company that provides entertainment in the form of fully nude dancers and topless bartenders for parties such as stags and birthdays. **LAMONT** has owned NLE for the last 25 years and, as of February 28, 2025, announced via open source social media that this season will be NLE's last season. **LAMONT** advertises NLE services using the Meta social media platforms Facebook and Instagram. **LAMONT** also recruits women to NLE using these Meta social media platforms. Law enforcement obtained subscriber records confirming that **LAMONT** is the subscriber to two Instagram accounts and at least one Facebook account (collectively the "Social Media Accounts"). These accounts are active and typically feature at least one new post a day. Furthermore, the Social Media Accounts and posts are publicly accessible.

22.     The Social Media Accounts often feature photographs depicting women—who are held out to be NLE employees—in various states of undress, posing provocatively, and sometimes touching each other or kissing each other. Based on these photographs, customers can select which women they want to work at their parties.

23.    The Social Media Accounts often feature posts seeking new employees.  For example, on February 28, 2025, the "Darryl **LAMONT** II" Facebook account posted:



24.    The postings for NLE often used the number 716-812-9171 as the contact number for NLE.  This phone number is subscribed to **LAMONT**.  Specifically, both 716-812-9171 and 716-310-1799 were subscribed to "Darryl L. Paul," with a billing address of one of **LAMONT**'s old addresses, and a date of birth matching **LAMONT's**.

25.    Throughout the years, **LAMONT** and CP-1 maintained a symbiotic relationship sharing employees.  **LAMONT** would recruit young vulnerable women from PGC to work for NLE, and he would also refer women to PGC for additional employment. In the course of the investigation into CP-1, law enforcement lawfully obtained some of CP-1's communications with others.  **LAMONT's** phone number, 716-310-1799, appeared in the contacts and text messages with CP-1.  For example on October 16, 2017, CP-1 and

**LAMONT** discuss sharing an employee:



26.     There is probable cause to believe that **LAMONT**, using force, fraud, and coercion, attempted to cause Victim 1 to engage in commercial sex in exchange for a thing of value with him and others.

27.     According to Victim 1, in or around early July 2024, when she was 19 years old, she met **LAMONT** when looking for a job at NLE.  Victim 1 called **a** phone number she found online affiliated with NLE and left a voicemail for him indicating her interest in a job. **LAMONT** called Victim 1 back and informed her that NLE was a stag party company, not a strip club and explained the difference.  **LAMONT** told Victim 1 that she could make a lot of money working for him.  **LAMONT** asked Victim 1 to send him pictures of herself and invited her for an interview.  Victim 1 complied and sent the photographs to **LAMONT** over 716-812-9171

28.     Victim 1 provided the text message threads she had with **LAMONT** to law enforcement.  After receiving photographs, on July 2, 2024, **LAMONT** invited Victim 1 to

audition and sent her his address from the 9171 number as depicted below:



29.     According to Victim 1, she went to **LAMONT**'s address, which was in an apartment complex, for the audition.    **LAMONT** met her outside of his apartment and immediately began telling them how he had "government plates" on his car.    **LAMONT** walked Victim 1 into his apartment.    After exchanging small talk, **LAMONT** asked Victim 1 to take her clothes off.    Victim 1 complied.    **LAMONT** then instructed Victim 1 to make a 360 degree turn so that he could see her body from every angle.    Once she was dressed, **LAMONT** asked Victim 1 to pose for photographs that he was going to post to the Social Media Accounts.    **LAMONT** told Victim 1 that he advertised women on Facebook and Instagram so that customers could select the women they wanted for stag parties.    Victim 1 confirmed to law enforcement that **LAMONT** posted her photograph and identified the photographs for law enforcement.

30.     During the interview, **LAMONT** also instructed Victim 1 to have a photoshoot done.    He told her that he had a photographer.    The next day, Victim 1 told **LAMONT** that she could not afford to do the photoshoot.    **LAMONT** provided Victim 1 with his other cell phone number (716-310-1799) and instructed her to communicate with him on that phone. Victim 1 saved this cell phone number as "D (boss)" in her phone, as reflected below:



31.     According to Victim 1, about four days later, she went to her first stag party. **LAMONT** instructed her to meet at his apartment before the stag party. **LAMONT** was not present that evening, but rather used his security guard to transport Victim 1 and other women from **LAMONT**'s residence to the stag party. Victim 1 witnessed one of the dancers take cocaine out of a compartment in **LAMONT's** residence and provide the cocaine to another dancer. Victim 1 smoked marijuana, which was provided by one of the dancers, with the group. Victim 1 posed in photographs with some of the other dancers. Victim 1 provided photographs to law enforcement that one of the NLE dancers sent to her after that evening. Victim 1 provided the photographs to law enforcement and law enforcement confirmed that the photographs appeared on the Social Media Accounts.

32.     At the stag party, Victim 1 watched two of the dancers strip naked and perform oral sex on each other. Victim 1 stated that **LAMONT** told her that dancers had to perform oral sex on each other, or at least fake it to make it look real. When asked what would happen if the women did not abide by the policy, **LAMONT** told her she did not want to know. Victim 1 took that as a threat and was afraid of **LAMONT**.

33.    A few days later, **LAMONT** arranged an audition for Victim 1 at another area strip club.  **LAMONT** also attended Victim 1's audition at the strip club.

34.    After the audition, **LAMONT** took Victim 1 shopping for stripper clothes. After shopping, **LAMONT** took Victim 1 back to his apartment for what he called "training."

35.    According to Victim 1, when they arrived at his apartment, **LAMONT** told Victim 1 that he knew a lot of important people and that he was friends with a lot of law enforcement officials and judges.  In addition, **LAMONT** knew names of Victim 1's family members—which she had never shared with him.  Victim 1 believed that **LAMONT** told her these things to intimidate her.  Indeed, **LAMONT** threatened at different points that he would tell Victim 1's family members that she was working for him.  **LAMONT** told Victim 1 that he provided drugs, such as cocaine and ketamine, to CP-1 to give to dancers at PGC and that they had a business arrangement.  **LAMONT** also told Victim 1 that she could move in with him.

36.    **LAMONT** offered Victim 1 an alcoholic drink, which she accepted, but did not drink.  He then proceeded to open a hidden box, located near his television.  **LAMONT** pulled out a serving tray that held a mirror and a mound of cocaine.  **LAMONT** also pulled out what looked to Victim 1 to be "bricks" of "white powder" from the same compartment. Victim 1 saw an additional brick, which she believed to be cocaine because while the other two bricks had duct tape wrapping, this brick was clear.  A search of **LAMONT's** publicly available Social Media Accounts, from March 2024 and May 2023, respectively, revealed the

photographs below, which feature what appears to be duct tape in the area described by

Victim 1:







Based on my training and experience, I believe that the white box on the bottom shelf in the

second photograph is Narcan.

37.    According to Victim 1, **LAMONT** offered her cocaine, which she refused.

**LAMONT**, however, forced her to sniff a line of cocaine in front of him. Victim 1, who had never tried cocaine before, sniffed the substance, but then went to the bathroom to blow her nose and try to get the powder out. As soon as Victim 1 exited the bathroom, **LAMONT** handed her another alcoholic drink and forced her to drink the entire contents in front of him.

38.    **LAMONT** then brought a chair out for Victim 1 to do "stripper tricks" on him. Victim 1 stated that she put her legs on top of **LAMONT**'s shoulders with her vagina in his face.

39.    After more "training", **LAMONT** brought Victim 1 into a different room that had a computer set up and photos of nude women hanging on the hall. **LAMONT** then forced Victim 1 to fill out of a nondisclosure agreement that prohibited her from telling anyone anything that occurred at **LAMONT's** house or the stag parties.

40.    Victim 1 stated that as soon as she signed the NDA, **LAMONT's** mood instantly changed. **LAMONT** went and grabbed cocaine, pushed her back in her seat, and put a line of cocaine on her breasts, snorting it off her. Victim 1 soon started to feel woozy and dizzy. **LAMONT** started to hold Victim 1's hands down, as Victim 1 pleaded for him to stop. **LAMONT** told her that she "would like it," and attempted to put his fingers in Victim 1's vagina. **LAMONT** spread her legs with his elbow, performed oral sex on her, and continued to attempt to put his fingers inside her vagina.

41.    According to Victim 1, over the next two days, **LAMONT** continued to text

Victim 1. She responded to the messages with lies to avoid seeing **LAMONT**. Finally, on July 18, 2024, Victim 1 sent a text message to **LAMONT** (depicted below), telling her that she was not going to work for NLE:



**LAMONT** threatened Victim 1 that if she did not work for him, then she would not be allowed to work at the strip club.

42.    Based on my training and experience, and on the evidence collected to date, there is probable cause to believe that **LAMONT** attempted to cause, using force, fraud, and coercion, Victim 1 into engaging in commercial sex acts with himself and others in exchange for a thing of value. Based upon the investigation to date, and the information and evidence described above, there is probable cause to believe that **LAMONT** possessed cocaine with the intent to distribute it and did distribute it to others.

43.    In addition to Victim 1, your affiant and other law enforcement officers have interviewed numerous witnesses who have stated that **LAMONT** gave them cocaine while in his residence. **LAMONT** offers the cocaine to the women beginning at the audition stage and continues providing cocaine to the women he employs. Based on my training, experience, and conversations with other law enforcement, **LAMONT** distributes cocaine as

a means of furthering his sex trafficking operation.

**WHEREFORE,** based upon the foregoing, I respectfully submit that there is probable cause to believe that in and around July 2024, in the Western District of New York, **LAMONT** violated the following statutes: Title 21, United States Code, Sections 841(a)(1) and (b)(1)(C) (possession with the intent to distribute narcotics), and Title 18, United States Code, Sections 1591, 1594 (attempted sex trafficking by force, fraud, and coercion).

_Jaclyn M. Coyne_
JACLYN M. COYNE
SPECIAL AGENT
FEDERAL BUREAU OF INVESTIGATIONS

Subscribed and sworn to

telephonically This 12th__ day of

March, 2025.

_____